Rose Finkle, Garnisher, Respondent, v. The Western Automobile Insurance Company, Fort Scott, Kansas, Garnishee of Harry Gruverman and Joseph Gruverman, Copartners, doing Business Under the Style and Firm Name of Joseph Gruverman & Son Bakery, Appellant.*—26 S. W. (2d) 843.

St. Louis Court of Appeals.    Opinion filed April 8, 1930.

286

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, section 3013, p. 1029, n. 30; Courts, 15CJ, section 512, p. 1083, n. 69; Garnishment, 28CJ, section 468, p. 310, n. 50; Insurance, 32CJ, section 265, p. 1152, n. 95; Judgments, 34CJ, section 1463, p. 1031, n. 6; Liability Insurance, 36CJ, section 104, p. 1113, n. 40; Trial, 38Cyc, p. 1486, n. 66.

*Curlee, Nortoni & Teasdale* for appellant.

*Foristel, Mudd, Blair & Habenicht* and *James J. O'Donohoe* for respondent.

BENNICK, C.—This is a garnishment proceeding in aid of an execution issued by the clerk of the circuit court of the city of St. Louis, pursuant to a judgment theretofore rendered in said court

for $5000, with costs amounting to $32.75, in favor of Rose Finkle as plaintiff, and against Harry Gruverman and Joseph Gruverman, co-partners, doing business under the style and firm name of Joseph Gruverman & Son Bakery, as defendants. Such judgment was rendered in an action for damages for personal injuries sustained by the plaintiff when struck by an automobile owned and operated by defendants, and included in the coverage of a policy of liability insurance theretofore issued by the garnishee herein to them.

The policy in question provided that "in consideration of the premium hereinafter set forth, and of the schedule of statements forming a part hereof," the garnishee "does hereby insure the assured . . . against loss from the liability imposed by law upon the assured, by reason of the ownership, maintenance or use of any of the automobiles hereinafter described."

Then followed an agreement on the part of the garnishee to defend in the name and on behalf of the assured any suit brought against the assured to enforce a claim covered by the policy; to pay all expenses incurred in such defense; and to reimburse the assured for any expense incurred for such immediate surgical relief as was imperative at the time of the accident.

Certain other provisions which are of no consequence on this appeal were next incorporated in the policy, after which came the provision that the insurance was subject to certain conditions enumerated thereafter, among which was the condition that the assured should give to the company immediate written notice of any accident covered by the policy, and like notice of any claim or suit resulting therefrom, together with every summons or other process served therein.

Then followed condition C, which is the provision of the policy directly involved on this appeal, reading as follows:

"Whenever requested by the company, the assured shall aid in effecting settlement, securing evidence and the attendance of witnesses, and shall co-operate with the company in all matters which the company deems necessary in the defense of any suit or in the prosecution of any appeal."

Reference is also made by counsel in the course of their argument to condition D, which was that the insurance should be due and payable to the assured when the amount of any claim or loss covered by the policy should have been fixed and rendered certain, either by final judgment against the assured, or by agreement between the parties with the written consent of the company.

Plaintiff's injuries were received on December 22, 1925, and on March 17, 1926, she filed her petition in the principal action. Summons was issued and served upon the defendants, and in due course the cause appeared upon the docket of the assignment division of

the ci· 1it court for April 18, 1927. Meanwhile Messrs. Wood & Teasd.. , had been employed by the garnishee to defend the action, but on April 20, 1927, the case not having been reached on the docket up to that time, they withdrew as attorneys for the defendants upon the ground of noncompliance by the latter with condition C of the policy, and on the following day, April 21, 1927, judgment was taken against defendants by default.

The evidence for the garnishee was that the damage suit was referred by it to its attorney, Teasdale, shortly after the petition was filed in March, 1926. Some little time thereafter, a deposition was called by plaintiff's attorneys, whereupon Teasdale requested defendants to come to his office for the purpose of going over the entire case. On that occasion he told them of their duties under the policy, and advised them that they would both be expected to testify, and that defendant Harry Gruverman, who had been the driver of the truck, would be the principal witness for the defense.

At that time defendants were engaged in the bakery business, ·at 1415 North Jefferson avenue, in the city of St. Louis, and it would appear that no other address was ever known to the garnishee.

The next meeting Teasdale had with the Gruvermans was in the forepart of June, 1926, when he prepared a letter for them to the Secretary of State, having to do with the transfer of an automobile license. In the course of the conversation, defendant Harry Gruverman informed Teasdale that the bakery business was bad, and that he and his father were thinking of giving it up, whereupon Teasdale felt prompted once again to impress upon them the necessity for holding themselves available for the trial. To the suggestion that he should not leave the city, defendant Harry Gruverman replied, "Oh, I ain't going to do you no dirty trick like that, Mr. Teasdale."

In the latter part of the same month, defendants again called upon Teasdale, but then or at no other time did they express to him their intention of leaving the city before the trial of the damage suit.

On April 5, 1927, approximately two weeks before the damage suit was set for trial, Teasdale wrote defendants at the North Jefferson avenue address, advising them of the setting of the case, and asking them to communicate with him at once so that arrangements might be made about the defense of the same. Some three or four days later this letter was returned to Teasdale undelivered, whereupon he sent out an investigator named Moll to canvass the neighborhood in an effort to locate defendants.

Moll was unable to find defendants, or any one who knew of their whereabouts, but he did hear gossip in the neighborhood that they had moved away, leaving a number of unpaid bills behind them.

Teasdale then wrote the automobile registration department to obtain whatever information might be contained in its files, and ascertained that the last record of such department was of February 9, 1927, when a transfer of title to defendants' automobile was made.

In the course of Moll's investigation he had come upon one Kramer, a former employee of the defendants, who had suggested that E. Bierman, of 1200 Biddle street, had been on friendly terms with defendants, and might know their address. Teasdale thereupon sent a letter addressed to defendants in care of Bierman, with a notation, "please forward," but this letter was also returned undelivered.

On April 20, 1927, upon Teasdale's withdrawal as counsel, he mailed another letter to defendants at their last known address, advising them of his withdrawal, and in the same mail he sent a similar letter to them in care of Bierman, both of which were returned undelivered. A letter was also sent to Bierman personally, requesting him to advise defendants of the entry of the default judgment, and while this letter was not returned, it went unanswered.

In December, 1928, a few days before the hearing of the garnishment case, private detectives were employed by Teasdale to hunt for the defendants, and their report disclosed that they had been gone from the city for about two years.

In the course of Kramer's examination, it was shown that defendants had gone to New York, although he did not know their street address. He testified, however, that defendant Joseph Gruverman carried a card from the bakers' union, and that his address could be obtained from the international headquarters of the union in Chicago.

As has been heretofore stated, the gist of the controversy between the parties, as made up by the pleadings, was in regard to the effect to be ascribed to condition C of the policy, requiring the assured to cooperate with the company in all matters which it deemed necessary in the defense of any suit.

The case was tried to a jury, resulting in the return of a verdict in favor of plaintiff, and against the garnishee, finding that the garnishee was indebted to defendants in the sum of $5032.75, with interest thereon at the rate of six per cent per annum from April 21, 1927. The garnishee was thereupon ordered to pay into the registry of the court within ten days the total sum of $5546.08, being the full amount of the indebtedness found by the jury to be owing to defendants, upon which it should stand discharged. This order was uncomplied with, whereupon final judgment was entered, from which the garnishee has duly appealed to this court.

The chief insistence of the garnishee is that the court, at the close of all the evidence, should have given its requested peremptory

294

instruction for a verdict in its favor, upon the theory that its own case, which was substantially based on documentary evidence, completely rebutted plaintiff's prima-facie case, in that it showed conclusively a violation by the defendants of condition C, the cooperation clause, of the policy. It argues in support of the point that the condition in an insurance policy requiring cooperation by the assured is valid and vital; that breach of it exonerates the insurance company from liability on the policy to the assured, or to any third party standing in the shoes of the assured; and that when the plaintiff's prima-facie case is rebutted by evidence in part in writing, which is undisputed, and which completely overcomes and destroys the prima-facie case theretofore made, the defendant is entitled to an instructed verdict in its favor.

Plaintiff argues to the contrary that no forfeiture is provided for in the policy in question on account of the assured's failure of cooperation, and that inasmuch as courts do not favor forfeitures, and never supply words to work forfeitures, not only was the garnishee's request for a peremptory instruction properly denied, but in fact her own requested peremptory instruction should have been given.

It is undoubtedly true, as counsel for the garnishee insist, that the requirement in a policy of liability insurance for cooperation on the part of the assured is valid and enforceable, and no case has been cited by opposing counsel holding to the contrary. While it would appear that the necessity for the construction of such a clause has but seldom arisen in this State, yet at least one case may be found where such a provision has been upheld (Mears Mining Co. v. Maryland Casualty Co., 162 Mo. App. 178, 144 S. W. 883), though the point in controversy therein was utterly dissimilar to that at bar.

Aside from the obligations arising from the law of contract, it is at once apparent that a condition of a policy requiring the cooperation and assistance of the assured in the defense of the action brought against him by the injured party is of the utmost importance in a practical sense, for without the presence of the assured, and his aid in the preparation of the case for trial, the insurance company is greatly handicapped, even to the point that such lack of cooperation may result in making the action incapable of defense. Consequently we know of no dissent to the view that as between the assured and the insurance company, the unexcused failure of the assured to comply with the condition of the policy requiring cooperation serves to prevent his recovery under the policy of the amount of the judgment, if paid by him. [Schoenfeld v. New Jersey Fidelity & Plate Glass Insurance Co., 203 App. Div. 796, 197 N. Y. S. 606; Coleman v. New Amsterdam Casualty Co., 126 Misc. Rep. 380, 213 N. Y. S. 522; United States Fidelity & Guaranty Co. v. Williams, 148 Md. 289, 129 Atl. 660.]

In other words, the situation calls for nothing more than the application of the familiar rule that the indemnitee, in order to be entitled to recover on his indemnity contract, must fully perform all conditions which by the terms of the contract are made conditions precedent to any liability on the part of the indemnitor. [Riggs v. New Jersey Fidelity & Plate Glass Insurance Co., 126 Ore. 404, 270 Pac. 479.]

Nor is there any doubt about the contention of counsel for plaintiff that courts abhor forfeitures, and refuse to read such a drastic provision into a policy of insurance when the parties themselves have not unmistakably inserted it therein. In such an instance as this, however, we do not understand that any forfeiture of the policy is involved. If the insurer is fortunate enough to escape liability, it is not necessarily by a forfeiture of the policy, for the policy may well remain in full force and effect as to those losses sustained by the assured where the conditions of the policy have been met, while a recovery may be defeated as to a particular loss in connection with which the assured was remiss in the performance of his obligations under the contract.

By this we mean that the condition of the policy requiring cooperation by the assured is in the nature of a condition precedent to liability on the company's part for the loss growing out of a claim with the disposition of which the assured's assistance is demanded; and we see no reason why we should hold that a breach of such condition in a given instance should have the effect of nullifying and vitiating the contract for all time and purposes. In other words, the failure of the assured to aid in securing information and evidence when requested by the company will not terminate the company's entire liability as a matter of law, the policy not expressly making such failure a cause of forfeiture, but in an action by the assured for indemnity to cover a particular loss sustained, his failure will be evidence for the company on the vital question of whether he was guilty of such a breach of his contract as to serve to defeat his action, and to relieve the company from liability therein. [Ward v. Maryland Casualty Co., 71 N. H. 262, 51 Atl. 900.]

What constitutes "cooperation" within a policy requiring the assured to cooperate with the insurer in the defense of an action brought against him, is usually a question of fact. [Coleman v. New Amsterdam Casualty Co., supra; Metropolitan Casualty Insurance Co. of New York v. Blue, 219 Ala. 37, 121 So. 25.]

Obviously it is not every failure to accede to the company's request for assistance that will have the effect of defeating the rights of the assured under his policy. Generally speaking, to constitute a breach of the cooperation provision of the contract, there must be a lack of cooperation by the assured in some material and sub-

stantial respect, and any formal, inconsequential, or collusive lack of cooperation will be immaterial. [George v. Employers' Liability Assurance Corporation (Ala.), 122 So. 175; Conroy v. Commercial Casualty Insurance Co., 292 Pa. 219, 140 Atl. 905; Riggs v. New Jersey Fidelity & Plate Glass Insurance Co., supra.]

For instance, while the refusal of the assured to assist in asserting a valid defense will excuse the company from liability (Collins' Ex'rs. v. Standard Accident Insurance Co., 170 Ky. 27, 185 S. W. 112), yet if his cooperation is improperly demanded, as where he is asked to aid in asserting a sham defense, his failure to cooperate will not release the company from its obligation under the policy. [Coleman v. New Amsterdam Casualty Co., supra.] Likewise, what would appear at first blush to be a breach of the cooperation clause may be excused, if it developes that the failure of the assured was due to mistake, and that there was no exercise of bad faith on his part. [Taxicab Motor Co. v. Pacific Coast Casualty Co., 73 Wash. 631, 132 Pac. 393; Conroy v. Commercial Casualty Insurance Co., supra; Guerin v. Indemnity Insurance Co., 107 Conn. 649, 142 Atl. 268.]

On the other hand, however, where the insurer is unable to make a defense, with the expectation of a fair presentation thereof, without the cooperation of the assured, a lack of cooperation without legal excuse or collusion, and in some material respect when needed, and not waived by the insurer, will be a good defense to an action by the assured on his contract. [Metropolitan Casualty Insurance Co. of New York v. Blue, supra.]

Considered in the light of the reported cases, such a material breach of the condition of the policy is most frequently evinced, either by the refusal of the assured to give the company whatever information he has respecting the claim which has been filed against him (Coleman v. New Amsterdam Casualty Co., supra; Collins' Ex'rs. v. Standard Accident Insurance Co., supra; Metropolitan Casualty Insurance Co. of New York v. Blue, supra; Conroy v. Commercial Casualty Insurance Co., supra); or where he willfully misinforms the company concerning essential facts, or colludes with the plaintiff in an attempt to defraud the company by refusing to testify to the real facts of the accident. [Bassi v. Bassi, 165 Minn. 100, 205 N. W. 947; Rohlf v. Great American Mutual Indemnity Co., 27 Ohio App. 208, 161 N. E. 232, and cases supra.]

Now in the case at bar, so long as they were in the city, defendants seem to have cooperated very fully with the garnishee, and to have acceded to every request for assistance which its counsel made. They came willingly to Teasdale's office when he expressed a desire to go over the case as a whole with them; they presented themselves in response to the notice to take depositions, and if they were not

cross-examined by Teasdale, it was through no fault of their own; and they gave him signed statements setting forth their version of how the accident had come about. There is not a hint that they ever willfully misinformed Teasdale as to a single fact, nor is there a pretense of any collusion between them and the plaintiff.

The only question in the case, therefore, is whether their act in leaving the city without notifying the company thereof, and without advising it as to their new address, was a breach of condition C of the policy, so as to enable the garnishee to escape liability for the loss sustained thereunder.

A number of cases are to be found in the books where there was presented to the court the precise question of whether it was a breach of the cooperation clause for the assured to leave the state before the day of trial. Some have decided one way, and some another, depending in each instance upon the peculiar state of facts before the court.

As a basic principle it must be borne in mind that it is merely the right to the assistance and cooperation of the assured which the company has under its policy, and that there is no express provision therein which requires the assured to come to the place of trial. [Rohlf v. Great American Mutual Indemnity Co., supra.] By this we do not intend to be understood as saying that the assured in every instance has his option either of attending or of staying away from the trial, for such would be a most unfair and impractical construction to put upon the contract. Certainly the presence of the assured himself at the trial, where his own testimony is vital to the defense, may well be a matter which the company would deem necessary to the adequate defense of the suit; but on the other hand, it cannot be said as a matter of law that merely because the assured leaves the State before the trial, he has breached his contract in a material respect so as to avoid the insurer's liability under the policy. [George v. Employers' Liability Assurance Corporation, supra; Rushing v. Commercial Casualty Insurance Co., 225 App. Div. 49, 232 N. Y. S. 255.]

Under such a situation, it appears that there are two ultimate questions to be determined: First, whether the assured was guilty of bad faith in leaving; and, second, whether the company exercised reasonable diligence in ascertaining his whereabouts, and in procuring his attendance at the trial, or his deposition for use in lieu of a personal appearance.

While there can be no doubt but that this case is an exceptionally close one, our conclusion is that a peremptory instruction for either party would have been improper. On the one hand we have the departure of the Gruvermans from the city, apparently some two months before the case was set for trial, with no notice given the

company, either of their intention to leave, or of the new address that they expected to have. There was evidence, though hearsay in character, that they departed leaving a number of unpaid bills be· hind them, from which the inference might undoubtedly·have been drawn that their purpose was to avoid their obligations outstanding in the city of St. Louis. They had previously given Teasdale their assurance that they would cooperate in every particular, and their subsequent conduct would fairly, though not conclusively, warrant the belief that their sudden exodus was prompted solely by bad faith.

On the other hand, however, it is just as legitimate to infer that they left in search of a location where their business prospects would be better, and that their failure to have notified Teasdale of their going was due to ignorance, inadvertence, or mistake, and not to bad faith and fraudulent motives. Certainly it does not conclusively appear that they made any attempt to secrete themselves in their new home. As we have heretofore stated, they had willingly and cheerfully complied with every request which Teasdale had made upon them; they did not know when the case would be called for trial; and in fact it was not given a setting until long after they had left the city.

But beyond this, we think it is an open question as to whether the garnishee used due diligence toward securing their attendance at court. From June, 1926, until April, 1927, Teasdale concededly made no effort to get in touch with them, although from his own testimony he would have us believe that he was fearful of their lack of cooperation all the while, and had even been told by one of them that they might move. He had been given an opportunity to interrogate them under oath, but had passed it by on the ground of trial policy. He waited until thirteen days before the case was to be called for trial to determine whether they were still in the city. No personal investigation was made until less than a week before the day of the trial. When nothing could be learned as to their whereabouts from their associates in the neighborhood where they had lived, he continued to send his letters to the address where he knew they were no longer to be found, and to Bierman, whom he had been advised knew nothing of their whereabouts. As a matter of fact there is room in the evidence for the belief that at the time he was sending his last series of letters to their old address, he either knew, or was chargeable with knowledge, that they had gone to the East, and indeed that he might have known, if he did not, that they were located in the city of New York. He made no attempt to locate them through the bakers' union, through which Kramer says they might have been found, until eighteen months after the default judgment was allowed to go against them, and then did not pursue his

inquiry to the point where it might reasonably have been successful. He sought no continuance from the court, but at the very first setting of the case arranged with plaintiff's counsel for his own withdrawal, and for the taking of a default judgment against his nominal clients.

Of all the reported cases that we have been able to find, the one perhaps most favorable to the garnishee is Schoenfeld v. New Jersey Fidelity & Plate Glass Insurance Co., supra. There the assured had left this country for Russia, leaving no address where he might be communicated with, and when the company was unable to locate him, it withdrew from the case, and allowed judgment to go against him by default. It is significant, however, that the company withdrew from the defense two months before the default was taken, and that its attempts to locate the assured had occurred over a long period of time prior thereto. Even upon such a state of facts the court held that the question of the company's good faith was for the jury to determine; and if there was a jury question present in the Schoenfeld case, how much more pointed is the issue in the case at bar, where the company put forth no active efforts to locate defendants until two weeks before the day the case was set for trial, and did not withdraw until the second day thereafter.

We repeat, therefore, that in our view of the law and the facts, there was a clear-cut issue for the jury to pass upon, from which it follows that the garnishee's request for a directed verdict at the close of all the evidence was properly denied.

During the course of the argument of plaintiff's counsel to the jury, a number of objections were interposed to statements which were directed to the issue of the good faith of the garnishee in seeking to avoid liability on account of the alleged failure of the defendants to have cooperated in the original action. The portion of the argument referred to covers some five pages in the printed abstract, and to set it out in full herein would serve no useful purpose. Some of the statements objected to were no doubt improper, while others were legitimate subjects of argument. It is to the credit of the trial judge that he ruled firmly and pointedly on each and every objection, and was as quick to repudiate the bad argument as he was to uphold the good. Under such circumstances we see no abuse of his discretion so as to warrant any interference at our hands.

For its next point the garnishee complains of instruction No. 2, given for plaintiff, which told the jury that if they found for plaintiff and against the garnishee, and if they found that the garnishee was indebted to defendants, they should allow plaintiff the sum of $5000, with interest, together with the further sum of $32.75, representing the court costs. The objection is that the jury were directed

300

to allow plaintiff the sum of $5000 and costs, rather than to find that the garnishee was indebted to the defendants in that amount.

There is no doubt that the instruction was technically erroneous,. and counsel for plaintiff so concede. That it was technically erroneous, however, is far from saying that it contained prejudicial error. It did very properly require the jury to find that the garnishee was indebted to the defendants. If it was thus indebted, there was no contention upon its part but that the measure of its obligation was the sum of $5000, and the costs. Consequently we cannot believe that the garnishee was in anywise harmed by the unfortunate language of the instruction, and counsel's contention to the contrary must be disallowed.

For its last point the garnishee· argues that the court erred in refusing to admit in evidence a signed statement given by plaintiff's own physician, which it claims was to the effect that plaintiff had not been seriously hurt. Its position here is that such statement was properly admissible as tending to show damage resulting to it from the assureds' failure to cooperate.

The general rule is that where one is bound to protect another from liability, he is bound by the result of litigation to which the other is a party, provided he had notice of the litigation, and an opportunity to control and manage it; and that the judgment rendered therein is conclusive in the subsequent action upon the indemnity contract as to all questions and issues necessarily determined there- in.

Here the garnishee not only had notice of the action, and an opportunity to control· and manage it, but under its policy, which was more than a mere indemnity contract, it was its duty to defend the action in the name and on behalf of the assureds, as a claim concededly covered by the policy. The only denial of liability was on the ground that the assureds had breached the condition of the policy requiring cooperation on their part, and on such question the liability of the garnishee to one standing in the shoes of the defendants must depend. If the assureds breached their policy, there was no liability on the garnishee's account for any part of the judgment in the damage suit, and if they did not breach it, then the garnishee is concluded by the judgment as to all issues necessarily determined therein, which must include the issue as to the extent of plaintiff's injuries. Consequently we rule that the statement of the doctor had no legitimate place in the case, and that the objection to its admission in evidence was properly sustained. [Carthage Stove Co. v. The Traveler's Insurance Co., 186 Mo. App. 332, 172 S. W. 458, aff. 274 Mo. 537, 203 S. W. 822.]

Along with the case there has been taken a motion of appellant to transfer the cause to the Supreme Court, by reason of the presence

in the case of various alleged constitutional questions which were first raised in the reply to plaintiff's denial of the garnishee's answer. Even if the constitutional questions were timely and properly raised, they were not preserved in the motion for a new trial, and hence the present motion should be overruled.

No other points arising for decision, it follows that the judgment rendered by the circuit court should be affirmed, and the Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The motion of appellant to transfer the cause to the Supreme Court is overruled; and the judgment of the circuit court is, accordingly, affirmed. *Haid, P. J.,* and *Becker* and *Nipper, JJ.,* concur.

## On Rehearing.

BENNICK, C.—A motion for rehearing has been filed by learned counsel for the garnishee in which they question the propriety of our opinion in two principal respects: First, that we have approved certain prejudicial argument to the jury on the part of plaintiff's counsel, and the erroneous ruling of the lower court upon objection thereto; and, second, that we have misconceived and misstated the evidence, particularly in respect to whether or not defendant Joseph Gruverman was carrying a card from the bakers' union when he departed from St. Louis for his destination in the East.

The complaints about the argument of plaintiff's counsel have now simmered down to two alleged improper remarks, one of which was that Teasdale knew that the Gruvermans could be found, and the other, that he had withdrawn from the case when he might have asked for a continuance, and have found the defendants; that the defendants were only his nominal clients; and that he was looking after the interests of his actual client, the insurance company, with the design of getting rid of the claim in that way. The ruling of the trial judge in each instance was merely that he would let the statement stand, though in disposing of the objection to the last remark, he did venture the suggestion that Teasdale would be at liberty to answer the argument.

Now counsel for the garnishee not only take the position that the argument of their adversary, considered along with what they claim was the approval given it by the trial judge, should have worked a reversal of the judgment, but also that in holding otherwise, we have departed from the rules heretofore laid down in the controlling decisions of this and the Supreme Court upon the subject of ap-

pellate interference with the ruling of a trial court on objections to alleged improper argument of counsel.

In our principal opinion we said that the court was guilty of no judicial indiscretion, inasmuch as it was as quick to repudiate the bad argument as it was to uphold the good; and after a full consideration of counsel's motion for a rehearing, we are still of the same thought. In other words, we consider the remarks of plaintiff's counsel which are now under scrutiny as having been directed to a fair and legitimate matter of comment, subject to answer by counsel for the garnishee in argument of like kind and character, as the lower court held.

The prime point in the case under the pleadings, evidence, and instructions, and the one to which all the argument seems to have been directed, was whether the garnishee had used reasonable diligence to ascertain the whereabouts of the Gruvermans, and whether it had disclaimed liability, and allowed default judgment to go against them, in good faith. Obviously the remarks of plaintiff's counsel had to do with this very issue, and he was entitled in a proceeding of this character, even though his language may have been somewhat extravagant, to minimize his opponent's efforts, question his diligence, and point out to the jury the identity and interest of his real employer in the damage suit, with his opponent equally entitled to address himself in reply to the identical matter.

It is also of significance that the learned trial judge took no sides in the matter, and said nothing which was in anywise calculated to lend his personal approval to the argument, but simply held in effect that the argument was directed to an open question in the case, which both parties were at liberty to discuss, and which the jury as the arbiters of fact would finally be called upon to determine for themselves. We see no misconception of the law in such a ruling, and hence are constrained to adhere to the view heretofore expressed that error was not committed.

As to the charge that we have misstated the evidence in support of plaintiff's point that defendant Joseph Gruverman had a union card when he left St. Louis, we simply quote from the testimony of garnishee's own witness, Kramer, as follows:

"Q. Joe Gruverman was the father? A. Yes.

"MR. O'DONOHOE: (Q). Did Joe Gruverman belong to your union? A. He did belong.

"Q. Did he belong to it up to the time you say he went to New York? A. He had to withdraw from the union.

"Q. When did the older one get his withdrawal card? A. As soon as he started in business. The first week he started in business he got his withdrawal card. All the bosses do.

"Q. All the bosses? A. Anybody start in business, the union wouldn't allow them to carry a full card.

"Q. Will they allow them to carry any card? A. Withdrawing card.

"Q. What do you mean by that? A. It costs $2.10 to be a full member; it costs half dollar to be a half member.

"Q. Which one did he belong to? A. Union No. 4.

"Q. Was he in the 50 cent class or the other? He belonged to the 50 cent class later on, when he became boss.

"Q. Was he a 50 cent class member when he left St. Louis? A. Yes, sir.

"Q. Did he then get a withdrawal card from the union? A. He has to get a full withdrawing card to belong to the union in New York—in any State.

"Q. What union does he belong to in New York—what branch? A. I forget that. I cannot tell. They got different locals over there.

. . . . . . .

"Q. Would you say the locals would or would not know what local he belongs to in New York? A. They may know at head-quarters.

"Q. The headquarters would know it? A. Yes.

. . . . . . .

"Mr. O'Donohoe (Q): You didn't go to the head lodge here, or head members of the order, and ascertain what union he was in in New York? A. They wouldn't tell. Tell you to find out in Chicago, the headquarters.

"Q. They wouldn't tell you where he was? A. The International in Chicago will tell you. He don't know here. He gets a with-drawal card and they let him go."

Accordingly, the Commissioner recommends that the motion for rehearing be overruled.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. Appellant's motion for rehear-ing is, accordingly, overruled. *Haid, P. J.,* and *Becker* and *Nipper, JJ.,* concur.