422 P.2d 129

John CARPENTER and Carol Ann Carpenter, husband and wife, Petitioners,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, Hon. Donald F. Daughton, Judge, Zurich Insurance Company, a Swiss Corporation, Steve Gasper and Lydia Gasper, husband and wife, and Maricopa Mortgage Co., Inc., a corporation, Respondents.

No. 8670.

Supreme Court of Arizona.

In Banc.

Dec. 28, 1966.

Rehearing Denied Jan. 31, 1967.

**566**

Kenneth S. Scoville, Leroy W. Hofmann, Phoenix, for petitioners.

Moore, Romley, Kaplan, Robbins & Green, by Robert H. Green, Kenneth J. Sherk, Phoenix, for respondents.

Samuel Langerman, Phoenix, amicus curiae American Trial Lawyers Ass'n.

Snell & Wilmer, by Roger W. Perry, Phoenix, O'Connor, Anderson, Westover, Killingsworth & Beshears, by John H. Killingsworth, Phoenix, Jennings, Strouss, Salmon & Trask by Ozell M. Trask, Phoenix, Lewis, Roca, Scoville, Beauchamp & Linton, by Nathan Holt, Phoenix, Phoenix Association of Defense Counsel by Rex H. Moore, Phoenix, amici curiae.

McFARLAND, Justice.

John Carpenter and Carol Ann Carpenter, husband and wife, herein referred to as petitioners, filed a petition with this court seeking issuance of a writ of certiorari to test the propriety of the granting of a motion for summary judgment by Donald F. Daughton, Judge of the Superior Court of Maricopa County, Division 17, respondent, in a garnishment proceeding instituted by petitioners against respondent Zurich Insurance Company, a Swiss corporation, herein referred to as Zurich.

On December 15, 1961, petitioner Carol Ann Carpenter was injured in a collision between her automobile and a truck being operated by Steve Gasper in the course of his employment with Maricopa Mortgage Co., Inc., herein referred to as Maricopa Mortgage. Petitioners filed suit against Steve Gasper, his wife Lydia Gasper, and Maricopa Mortgage Co., Inc., on June 26, 1962, with service of process on all parties. Maricopa Mortgage forwarded the summons and complaint to its insurer, Zurich, and counsel for Zurich filed an answer on behalf of Maricopa Mortgage and the Gaspers. The record does not show that counsel ever consulted or attempted to discuss with the Gaspers the facts of the case, or the policy coverage, either before or after the answer was filed.

Written interrogatories for Steve Gasper were mailed on July 20, 1962, to counsel retained by Zurich. Defense counsel notified petitioners that Steve Gasper had disappeared, and no answers to the interrogatories were filed. On September 17, 1962, Steve Gasper's deposition was noticed for October 10, 1962, but Gasper failed to appear.

On November 19, 1962, petitioners moved to strike the answer insofar as it applied to Steve or Lydia Gasper under Rule 37(d), Rules of Civil Procedure, 16 A.R.S. based on Steve Gasper's failure to answer the written interrogatories or appear for the taking of his deposition. This motion was granted January 11, 1963. On September 27, 1963, defense counsel moved to withdraw as attorneys for Steve and Lydia Gasper, which motion was granted November 12, 1963.

On March 19, 1964, default judgment was entered against Steve and Lydia Gasper in the amount of $55,295.00, plus costs, the amount prayed for in petitioners' complaint. The Gaspers were not present at this hearing, nor were they represented by counsel.

Petitioners, as judgment creditors of the Gaspers, then instituted garnishment proceedings against Zurich as garnishee-defendant, by causing a writ of garnishment to be served on the Arizona Insurance Director, statutory insurance agent for Zurich. A.R.S. § 20-221. Zurich denied indebtedness on the ground of non-cooperation. Zurich moved for summary judgment,

presenting affidavits in support of its alleged inability to locate Steve Gasper. The motion was granted, and summary judgment was entered in favor of Zurich on June 30, 1965. Certiorari was then granted by this court.

The insurance policy was issued by Zurich to Maricopa Mortgage, and Steve Gasper was an additional insured as an employee of Maricopa Mortgage.

The legal foundation for Zurich's attorneys' withdrawal as counsel for the Gaspers, and Zurich's denial of its indebtedness under the policy in the subsequent garnishment action, is Steve Gasper's violation of the "non-cooperation clause" of the policy which provides as follows:

> "Zurich Insurance Company * * * Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:
>
> *    *    *    *    *    *
>
> CONDITIONS
>
> *    *    *    *    *    *
>
> "12. Assistance and Cooperation of the Insured. The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits."

This provision must be read in conjunction with the "no action clause" in determining Zurich's liability under the policy, as the rights of a judgment-creditor of an insured are no greater than those of the insured, in whose shoes he stands. Fidelity & Casualty Co. of New York v. McConnaughy, 228 Md. 1, 179 A.2d 117; 8 Appleman, Insurance Law and Practice § 4817. Petitioner, as garnishor, obtained no rights in the policy superior to those of his judgment debtor, the insured. A.R.S. § 12–1585, Ellery v. Cumming, 40 Ariz. 512, 14

P.2d 709, 83 A.L.R. 1081. The "no action clause" provides as follows:

> "13. Action Against Company. No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company."

Petitioners contend that Zurich's evidence presented in support of its motion for summary judgment fails to show willful non-cooperation on Steve Gasper's part and also fails to show the required diligence on the part of Zurich in attempting to secure this cooperation.

The following is a summary of the statements contained in the uncontroverted affidavits.

The Arizona claims superintendent for Zurich forwarded suit papers to Zurich's attorneys on July 3, 1962, and requested they defend on behalf of Maricopa Mortgage Co. and Steve and Lydia Gasper. On being informed September 5, 1962, that the attorneys were unable to locate Steve Gasper, he and other members of the Zurich office attempted on numerous occasions to locate Steve Gasper and Lydia Gasper, or either of them. This included visits to Steve Gasper's last-known address by several persons and telephone calls to that address and to Maricopa Mortgage, Steve Gasper's former employer.

An affidavit in support of the motion to withdraw as counsel, placed on file and incorporated by reference in Zurich's motion for summary judgment, attempts to meet the requisites necessary to show non-cooperation as follows:

> " * * * [T]hat defendant Gasper's whereabouts have been unknown to the defendant Maricopa Mortgage Co., Inc. or to its attorneys of record up to the present time; that both defendant Maricopa Mortgage Co., Inc. and its attor-

neys of record have diligently searched for defendant Gasper, both within the state and without, through personal investigation by their agents and by the United States mail; that despite these efforts to locate defendant Gasper his whereabouts remain unknown to both defendant Maricopa Mortgage Co., Inc. and its attorneys of record; that both defendant Maricopa Mortgage Co., Inc. and its attorneys of record have exhausted every possible avenue in their unsuccessful attempt to locate defendant Gasper. "Defendant Gasper has failed to answer the interrogatories propounded by plaintiff and has in every way failed to assist his attorneys of record in preparing his defense."

· Zurich contends that the question of Zurich's diligence was not raised in the lower court, and, further, that it was incumbent upon petitioners to controvert the affidavits in support of Zurich's motion, and, in absence of such response, summary judgment must be given for the moving party under Rule 56(e), Rules of Civil Procedure, 16 A.R.S.

■ The insurer has the burden of proving the insured's breach of the non-cooperation clause in order to defend successfully on that ground. Western Casualty & Surety Co. v. Weimar, 9 Cir., 96 F.2d 635; Employers Ins. Co. of Alabama v. Crook, 276 Ala. 177, 160 So.2d 463; Mariani v. Bender, 85 N.J.Super. 490, 205 A.2d 323; Employers Mut. Cas. Co. v. Ainsworth, 249 Miss. 808, 164 So.2d 412; State Farm Mut. Automobile Ins. Co. v. Farmers Ins. Exchange, 238 Or. 285, 387 P.2d 825, 393 P.2d 768. The question of Zurich's failure to show a breach of the non-cooperation clause was raised in the lower court in petitioner's objection to the form of judgment, wherein petitioner stated:

"1. The court has not and could not find that defendant Steve Gasper 'committed a substantial and material breach of the cooperation clause' since the affidavits submitted in support of garnishee's motion for summary judgment are totally insufficient, both factually and legally to establish such a breach.

"2. The court has not and could not find that such breach (if any) 'materially and substantially prejudiced garnishee-defendant' since such affidavits are likewise insufficient to establish such a finding."

■ As the burden is on Zurich to show the insured's breach, Zurich is necessarily obligated to show all of the elements of this defense, including its own diligence in notifying the insured of the need for assistance, and in its attempts to locate the insured. Without these elements, Zurich could not show a breach of the non-cooperation clause entitling it to receive summary judgment in its favor. Therefore, the issue was properly presented to the trial court and the record necessitates its consideration on certiorari.

The contention that it is incumbent upon the party opposing the motion to file controverting affidavits in order to preclude having judgment rendered against them was considered by this court in Lujan v. MacMurtrie, 94 Ariz. 273, 383 P.2d 187, wherein we stated:

"Defendants rely upon Perez v. Tomberlin, 86 Ariz. 66, 340 P.2d 982, for the general proposition that the opposing party must in all events contradict the affidavit of the moving party. In that case the plaintiff filed a controverting affidavit which merely denied in general terms the allegations of the moving party and was held ineffective in raising any triable issue of material fact, and cannot, therefore be construed as supporting the position of the defendants. See also Martinez v. Coombs, 93 Ariz. 127, 379 P.2d 118 and National Life & Casualty Co. v. Mowre, 93 Ariz. 231, 379 P. 2d 902.

"Rule 56(e) provides that 'When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but

must answer in detail as specific as that of the moving papers, setting forth the material facts as he believes and intends to prove them to be. If he does not so answer under oath, summary judgment shall be entered against him.' The foregoing provision was recommended as an amendment to Federal Rule 65(e) by the advisory committee in 1955 because of conflicting rulings of the District Courts, but was not adopted by the United States Supreme Court. Its purpose was to make clear that a mere pleading allegation did not create a fact issue in face of a proper affidavit on any particular issue of fact. It was not the purpose of the amendment to create a battle of affidavits. 3 Barron & Holtzoff Federal Practice & Procedure § 1235.1, at 157 (1958). Therefore, if the papers of the moving party fail to show that he is entitled to judgment as a matter of law, the opposing party need not file an opposing affidavit. Chenault v. Nebraska Farm Products, D.C., 107 F.Supp. 635; 6 Moore's Federal Practice (2nd ed. 1953) § 56.15(3) at 2126.

"Rule 56(e) is explicit in requiring that 'Supporting and opposing affidavits shall be made *on personal knowledge,* shall set forth such *facts as would be admissible in evidence,* and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' (Emphasis added.) Obviously mere conclusions of ultimate fact as are permitted in pleadings and conclusions of law do not meet this test. 6 Moore's Federal Practice (2nd ed. 1953) § 56.22 at 2328, and cases there cited. We feel that the affidavit of the defendant, Dave MacMurtrie, falls short of these standards. A proper affidavit may require more effort than the pleadings themselves and should be prepared with as much care as if the affiant were testifying in court. The crucial function of the summary judgment as a final judgment on the merits of the case requires that the affidavit meet with the requirements of the rule." 94 Ariz. at 277, 278, 383 P.2d at 190.

The bald statements in the supporting affidavit that Zurich's attorneys have "diligently searched" and that they have "exhausted every possible avenue" are mere conclusions of the affiant and add nothing to aid the court in its determination.

This brings us to petitioner's contention that as a matter of law Zurich's evidence fails to show non-cooperation on Steve Gasper's part, and also fails to show the required diligence on Zurich's part in attempting to locate him. Cooperation implies assistance. American Surety. Co. v. Sutherland, D.C., 35 F.Supp. 353. The courts have rather uniformly held that there is a duty on the insurer as well as the insured in compliance with the policy condition of cooperation. Gregory for Use of Cusimano v. Highway Insurance Company, 24 Ill.App.2d 285, 164 N.E.2d 297, spelled out the requisites that must be satisfied by an insurer, as follows:

"* * * The burden of proof is upon the garnishee-defendant to establish by a preponderance of the evidence the various affirmative defenses raised in its pleadings. Policies of the kind in controversy here do not stipulate against liability in every case of non-cooperation. It is only non-cooperation *after request by the insurer* which constitutes a policy defense to an insurance carrier. Thus, a liability policy requiring the insured at the insurer's request to assist in the defense or to render cooperation in connection with the suit is not breached where the insurer makes no request that the insured do so, and this is so even though the whereabouts of the insured are unknown. (citations omitted) It is incumbent upon the insurer in order to avail itself of this defense that it show its good faith in attempting to locate its insured. (citations omitted) In short, the question of cooperation involves not only the good faith of the insured but the good faith of the insurer as well." 164 N.E.2d at 303.

In the case of Pennsylvania Threshermen & Farmer's Mutual Casualty Ins. Co.

v. Owens, (4 Cir.) 238 F.2d 549, the policy clauses in question were exactly the same as those in the instant case. In speaking of the reciprocal nature of the non-cooperation clause, the court said:

> "The problem of non-cooperation has a dual aspect: not only what the assured failed to do, but what the insurer on its part did to secure co-operation from an apathetic, inattentive, or vanished policy holder, must be considered. Liability insurance is intended not only to indemnify the assured, but also to protect members of the public who may be injured through negligence. Indeed, such insurance is made mandatory in many states. It would greatly weaken the practical usefulness of policies designed to afford public protection, if it were enough to show mere disappearance of the assured without full proof of proper efforts by the insurer to locate him. See Tuder v. Commonwealth Casualty Company, 163 A. 27, 10 N.J. Misc. 1206." 238 F.2d at 550.

■ It is clear that the question of non-cooperation in the case of an absent insured concerns not only the good faith of the insured, but that of the insurer as well. Jameson v. Farmers Mutual Auto. Ins. Co., 181 Kan. 120, 309 P.2d 394; Gregory for Use of Cusimano v. Highway Insurance Company, supra. It follows that there is a duty to exercise reasonable diligence to secure the assistance of the insured, including a request for such assistance and reasonable efforts in attempting to locate him. Gregory for Use of Cusimano v. Highway Insurance Company, supra; Nationwide Mutual Ins. Co. v. Tillman, 249 Miss. 141, 161 So.2d 604. Where the insured is an "additional insured" and not a named party to the contract, the insurer must show that the insured knew of the insurance coverage or that some reasonable effort was made to apprise the insured of the existence of the policy and its conditions. Constanzo v. Pennsylvania Threshermen and Farmers' Mutual Casualty Ins. Co., 30 N.J. 262, 152 A.2d 589.

In Finkle v. Western Auto. Ins. Co., 224 Mo.App. 285, 26 S.W.2d 843, the question presented was broken down into its necessary components, the court stating:

> "The only question in the case, therefore, is whether their act in leaving the city without notifying the company thereof, and without advising it as to their new address, was a breach of condition C of the policy, so as to enable the garnishee to escape liability for the loss sustained thereunder.

> \* \* \* \* \* \*

> "Under such a situation, it appears that there are two ultimate questions to be determined: First, whether the assured was guilty of bad faith in leaving; and, second, whether the company exercised reasonable diligence in ascertaining his whereabouts, and in procuring his attendance at the trial, or his deposition for use in lieu of a personal appearance." 26 S.W.2d at 848.

■ In the instant case there is a complete failure of any showing of lack of good faith on the part of the insured, Steve Gasper. The most that may be inferred from the affidavits is that Steve Gasper did not live at that address or that he moved without leaving a forwarding address or notifying his former employer. There is no showing that Steve Gasper ever knew of the existence of the insurance policy or of Zurich Insurance Company, much less that he knew of any duty to keep it informed of his whereabouts.

There is also an insufficient showing of good faith in exercising reasonable diligence on the part of the insurer, Zurich. The affidavits filed by Zurich's counsel fail to state the nature of their efforts to locate Steve Gasper, or when these efforts were carried out. Insofar as it may rely on its defense of non-cooperation, it is very much to the insurer's benefit that the insured not be located. Bachman v. Monte, 326 Pa. 289, 192 A. 485. Had Steve Gasper been told Zurich would defend, he would have had a greater incentive to assist in the defense; therefore, there must be an

affirmative showing of a search carried out in good faith, reasonably calculated to achieve success. Cf. Jensen v. Eureka Casualty Co., 10 Cal.App.2d 706, 52 P.2d 540; Pennsylvania Threshermen & Farmer's Mutual Casualty Ins. Co. v. Owens, supra.

The affidavit by Zurich's Arizona claims superintendent states the fact that he personally made telephone calls and visits to Steve Gasper's former residence; he made telephone calls to Maricopa Mortgage; and visits to Gasper's former address were made by two other Zurich agents. All of these efforts took place no earlier than September 5, 1962—more than nine months after the accident, and two months after the complaint was served on Gasper. Nowhere does it appear that Gasper was ever notified of his coverage or duty to cooperate, although Zurich had been informed of the suit for over two months at the least, and had caused its attorneys to file an answer in Gasper's name.

The affidavits do not show that letters were sent in the United States Mail to Gasper or to others who might know his whereabouts before the motion was made to withdraw.

The facts in the instant case are similar to those in Nationwide Mutual Ins. Co. v. Tillman, 249 Miss. 141, 161 So.2d 604, wherein the court, in commenting on the facts in that case, said:

"* * * The long delayed and wholly insufficient efforts to contact the insured indicate a lack of genuine desire to promptly locate the insured. This pronounced dillydally in trying to locate Eddie Tellie makes the case at bar, as to requisite diligence and good faith, even weaker than the Wallace case. [Wallace et al. v. Universal Ins. Co., 18 A.D. 2d 121, 238 N.Y.S.2d 379] The appellees herein showed far greater diligence and honest effort to locate the insured than did the appellant, and they extended to the appellant curtesies, and supplied essential information and proof beyond which they were required to do.

"The appellant failed to make inquiries from insured's neighbors and acquaintances, to ascertain where he was or where he went for recreation or pleasure, or the names of his associates and friends. The appellant made no inquiries at the insured's former residence to find out, if possible, where he had moved. No inquiries were made of the Buffalo Police Department, or the New York State Police. No check was made with the Missing Person's Bureau, the Motor Vehicle Department of New York, the Post Office Department of Buffalo. No contacts were made with the State, County or Federal Unemployment or Social Security Agencies. The F. B. I. was not contacted. In short, the appellant did nothing but write two or three letters, make a few telephone calls, and send one adjuster to the insured's former address, two months after he had left it, and two months after the appellant knew of the accident. Even appellant's last act, that of finally employing counsel to defend this suit indicates a lack of diligence and good faith because appellant had already by its former lack of diligence and good faith made the successful defense of this suit nothing less than a miracle." 161 So.2d at 617.

We feel that, under the circumstances and in view of Zurich's dilatory tactics in regard to its additional insured, the facts as brought forth in these affidavits are insufficient as a matter of law to establish non-cooperation and reasonable diligence in securing cooperation.

■ Zurich contends that to render judgment against it in the instant case would be in violation of the due process clauses of both the Arizona and the Federal constitutions. This claim is grounded on the theory that after the withdrawal of counsel for the Gaspers, Zurich received no notice of the application for default judgment, and therefore "[n]o notice or opportunity to be heard on the question of liability or damages was given to Zurich. * * *"

Zurich contends it was forced to withdraw its attorneys as counsel for the Gaspers to prevent a waiver of the defense of non-cooperation. Assuming, but not deciding, this may have been necessary, it was Zurich's voluntary decision to relinquish its contract right to maintain control over the defense of the litigation. By so doing, it acted at its peril, and must bear the legal consequences of any breach of contract. Vol. 7A Appleman, supra, § 4686, p. 473. As stated by the California Supreme Court in Comunale v. Traders and General Ins. Co., 50 Cal.2d 654, 328 P.2d 198, 68 A.L.R. 2d 883:

> " * * * An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract. * * *" 328 P.2d at 202.

Counsel for Zurich cite the case of Phoenix Metals Corporation v. Roth, 79 Ariz. 106, 284 P.2d 645. In that case we held that a corporation which had appeared in the action and had a default judgment rendered against it without the notice required by Rule 55(b), Arizona Rules of Civil Procedure, 16 A.R.S., was deprived of due process of law. That case is not in point here. Rule 55(b) provides, in pertinent part:

> "55(b) Judgment by default. Judgment by default may be entered as follows:
> "1. In all cases the party entitled to a judgment by default shall apply to the court therefor, * * *. If the party against whom judgment by default is sought has appeared in the action, he * * * shall be served with written notice of the application for judgment at least three days prior to the hearing on such application." 16 A.R.S., Rule 55(b)

Zurich is not "the party against whom judgment by default is sought" as was the defendant in the Roth case. The insurer has the opportunity to test its liability in the subsequent garnishment action, as Zurich has done in the instant case. Appleman, supra, § 14565; Standard Acc. Ins. Co. v. Leslie, D.C., 55 F.Supp. 134. As Zurich was merely a potential garnishee, was not a party, and did not appear in the original action, we feel it was not deprived of due process.

Petitioners also urge that the judgment of the lower court should be reversed for the reason that the facts in the instant case are controlled by the decision in Jenkins v. Mayflower Insurance Exchange, 93 Ariz. 287, 380 P.2d 145 (1963). Since we hold that Zurich is not entitled to summary judgment on the merits, it is not necessary for us to determine the extent to which the rules of law as set forth in Mayflower are applicable to the instant case.

The judgment of the trial court is reversed, and the case remanded with directions to enter judgment for petitioners against the garnishee-defendant.

STRUCKMEYER, C. J., and UDALL and LOCKWOOD, JJ., concur.

BERNSTEIN, Justice (dissenting).

I regret but I must disagree with the majority's disposition of the instant case. The court's majority decision in neglecting to consider the applicability of the case of Jenkins v. Mayflower Insurance Exchange, 93 Ariz. 287, 380 P.2d 145 to the present facts fails, I think, to take proper opportunity to rule on the limits of that decision. From its very inception the Mayflower decision has caused increasing confusion among insurance companies, insured motorists, and the courts of this state concerning the law as it relates to automobile liability insurance policies. It was my understanding that it was for the purpose of lending badly needed clarity to our insurance law that we chose to grant certiorari in this cause. In the granting of such discretionary writs our guiding principle and major obligation is to provide an extraordinary remedy where it appears that essential justice cannot be satisfactorily accomplished by other means. A failure

to here treat the confusion engendered by the Mayflower decision would, I believe, make it improvident to have granted certiorari in the first place.

Petitioners brace their case on two grounds: one, that this court's decision in Mayflower, supra, precludes the defendant from asserting the policy defense of "non-cooperation" on the part of the insured, and two, that should such a defense be recognized, the defendant has nevertheless failed to establish it. The majority chooses to side-step the petitioners' first contention. They apparently feel that this case can best be decided on petitioners' second contention, and to do so rely on their finding that the defendant has failed to prove "non-cooperation" as a matter of law. Although appellate evasiveness is a warranted tactic under proper circumstances, I do not think such circumstances are present here.

The decision of the majority represents considerable research and not inconsiderable declarations and conclusions concerning the policy defense of "non-cooperation". Completely neglected, however, is the primary question of whether a defense of "non-cooperation" even exists in this state by reason of the Mayflower decision. Indeed, if Mayflower does apply to the present facts, as it certainly seems to, there is no such defense as "non-cooperation". I would consider it a waste of time, effort and ink to expound at length on the elements of a non-existent defense. Such shadow boxing is better left for the gymnasium. It is my opinion, therefore, that under the circumstances, this court would better serve its purpose by meeting directly the petitioners' contention that our decision in Mayflower abrogates an insurance company's policy defense of non-cooperation. My analysis of the problem is set out below.

In Mayflower, we held that the omnibus clause in Arizona's Motor Vehicle Safety Regulations Act, A.R.S. § 28–1170, subsec. B, par. 2, would be considered a party of *every* insurance policy issued in this state and that an insurer could not limit its liability contrary to its terms. Citing our decision in Schecter v. Killingsworth, 93 Ariz. 273, 380 P.2d 136 upholding the constitutionality of the Safety Responsibility Act, we refused to distinguish between voluntary and certified policies of insurance in applying the mandatory omnibus clause. (The basic difference between the two policies explained in detail, infra, is that the former is used to prove financial ability to pay a judgment that may result from a *past* accident while the latter is used to prove financial ability to pay judgments that may result from possible *future* accidents.) The public policy reasons for refusing to recognize the distinction, and which lay at the foundation of the Mayflower decision, appear in the following quote from the Mayflower opinion:

> "Where the basis upon which this act has been declared constitutional is, 'preventing financial hardship and possible reliance upon the welfare agencies,' we cannot constitutionally allow artful distinctions between 'motor vehicle liability policy,' 'automobile liability policy' or 'policy of insurance' to defeat the purpose of the act." Mayflower, supra, 93 Ariz. pp. 290–291, 380 P.2d p. 147.

The public policy reasons for refusing to distinguish between voluntary and certified insurance coverage in holding, as petitioners urge, that an insurance company cannot raise a defense of the insured's "non-cooperation" would be exactly the same. Just as the Safety Responsibility Act provides a mandatory omnibus clause,[1] it

1. "A.R.S. § 28–1170, subsec. B, par. 2:
B. The owner's policy of liability insurance must comply with the following requirements:
2. It shall insure the person named therein and any other person, as insured, using the motor vehicle or motor vehicles with the express or implied permission

of the named insured, against loss from the liability imposed by law for damages arising out of the ownership, maintenance or use of the motor vehicle or motor vehicles within the United States or the Dominion of Canada, subject to limits exclusive of interest and costs, with respect to each motor vehicle as follows:"

likewise provides, as follows, that policy violations by the insured will not preclude recovery by the injured plaintiff:

"F. Every motor vehicle liability policy shall be subject to the following provisions which need not be contained therein:

1. The liability of the insurance carrier with respect to the insurance required by this chapter shall become absolute when injury or damage covered by the motor vehicle liability policy occurs. The policy may not be cancelled or annulled as to such liability by an agreement between the insurance carrier and the insured after the occurrence of the injury or damage, and no statement made by the insured or on his behalf and no violation of the policy shall defeat or void the policy." A.R.S. § 28–1170, subsec. F, par. 1.

It is reasonably concluded, therefore that the Mayflower case dictates a finding that an insurance company may not assert a "non-cooperation clause" defense just as it may not provide for restrictive coverage if an automobile was operated by certain persons other than the named insured. Therefore, if Mayflower is to continue as the law in this state, the majority's concern with whether the defendant had established a defense of non-cooperation is purely academic.

Thus, it seems to me, we come face to face with our Mayflower decision and the question of whether it should remain the law in Arizona. For reasons outlined below, I for one, think it should not.

To properly understand the difference in meaning and effect between an "automobile liability" or uncertified policy on the one hand, and a "motor vehicle liability" or certified policy on the other,[2] it is necessary to

analyze the method of protection provided for injured motorists and pedestrians in our Uniform Motor Vehicle Safety Responsibility Act. A.R.S. Title 28, chap. 7.[3]

Briefly outlined, it works as follows. Whenever a driver is involved in an accident, he is required by A.R.S. § 28–1141 to file an accident report with the supervisor of financial responsibility. If damage in excess of one-hundred dollars to person or property results from the accident, then the supervisor will suspend the license and automobile registration of the driver *unless* he produces proof of his ability to satisfy a judgment that might, in the opinion of the supervisor, be rewarded against him. Such financial capability is normally proved by producing a qualified insurance policy covering the driver and automobile involved in the accident. This is what is called an "automobile liability policy." To qualify as proof of financial responsibility under the Act it need *only* (1) to be a policy issued by an insurance company authorized to do business in Arizona (or if not authorized to do business in this state, have authorized the supervisor to accept service in its behalf), and (2) meet with certain minimum (monetary) coverage provisions. These procedures and requirements are included under Article 3 of the Act, entitled "Security Following an Accident."

Under Article 4, entitled "Proof of Financial Responsibility for the Future" the Uniform Act provides a different approach for the protection of people injured on the highway. This Article applies only when a judgment against a driver has not been satisfied. His license is suspended until the judgment is paid and the driver gives proof of his *future* financial responsibility.

The proving of this future financial responsibility is when the "motor vehicle lia-

2. Improvidently termed an "artful distinction(s)" in the Mayflower decision.

3. Arizona, like the great majority of other states having no compulsory insurance

law, has adopted the Uniform Act as a means of inducing motorists to insure themselves. The method of this inducement will be made clear in the following text.

bility policy" comes into play.[4] By filing this "certificate of insurance" with the supervisor, the driver can regain his right to drive. The certified policy differs significantly from the non-certified policy in that it must comply with extremely strict requirements concerning its coverage. As seen earlier, these requirements include a mandatory omnibus clause as well as the general provision prohibiting insurance companies from raising policy defenses that would prevent recovery by the injured third party.

Thus it is clear from the structure of the Uniform Act, as well as its specific provisions, that there is a meaningful distinction between a certified and a voluntary or uncertified insurance policy. Its clarity is attested to by the fact that almost every state that has ruled on the matter has recognized this distinction. Cohen v. Metropolitan Casualty Ins. Co., 233 App. Div. 340, 252 N.Y.S. 841; United States Fidelity & Guaranty Company v. Walker, 329 P.2d 852 (Okl.); McCarthy v. Insurance Co. of Texas, 271 S.W.2d 836 (Tex. Civ.App.); State Farm Mutual Automobile Ins. Co. v. Arghyris, 189 Va. 913, 55 S.E. 2d 16; Royal Indemnity Co. v. Olmstead, 9 Cir., 193 F.2d 451, 31 A.L.R.2d 635; Laughnan v. Griffiths, 271 Wis. 247, 73 N.W.2d 587; McCann for Use of Osterman v. Continental Casualty Company, 8 Ill.2d 476, 134 N.E.2d 302; Hoosier Casualty Company of Indianapolis, Indiana v. Fox, D.C., 102 F.Supp. 214. In Cohen v. Metropolitan Casualty Ins. Co., supra, the court said:

"A reading of the whole act, and, in particular, sections 94–i, 94–d and 94–e, convinces us that the words 'Motor Vehicle Liability Policy', as defined in the act must refer to 'required' policies only. To make the act applicable to all liability policies would mean that whenever such a mishap occurred the insurance carrier would always be absolutely liable under all circumstances. We cannot concur with this reading. The purpose to be furthered by the act, and its limitations, are clearly apparent. It is intended to protect the public from suffering loss through the carelessness of automobile owners who have manifested their financial irresponsibility. It differentiates between car owners who have shown themselves to be irresponsible, and those who have not. It declares that when those who carry liability policies through legal compulsion cause damage in automobile operation, their insurance carriers are absolutely liable for the resulting loss; but it lays down no such rule in the case of the automobile owner voluntarily carrying such a policy, whose responsibility has never been questioned." 252 N.Y.S. p. 842.

And in Royal Indemnity Co. v. Olmstead, supra, the distinction was recognized in the following terms:

"* * * As a general rule, unless a policy can be construed as creating an independent right of action in the injured party (footnote omitted), his right to recover, being derivative, normally is subject to any defense the company may have against the insured (citations omitted). An exception to the general rule has been made in situations where the insurance policy was issued to satisfy the requirements of a statute having as its purpose the protection of the public. Under such circumstances the beneficial purpose of compulsory insurance would be thwarted in the event the insurer be permitted technical defenses under the policy relating to conditions wholly outside the ability of the injured person to secure performance of. Hence, it has

4. A.R.S. § 28–1170, subsec. A provides the definition of a motor vehicle liability policy:
"A. A 'motor vehicle liability policy' as the term is used in this chapter means an owner's or an operator's policy of liability insurance, certified as provided in § 28–1168 or § 28–1169 as proof of financial responsibility, and issued, except as otherwise provided in § 28–1169, by an insurance carrier duly authorized to transact business in this state, to or for the benefit of the person named therein as insured."

been held that in cases involving compulsory insurance the insurer cannot urge lack of cooperation by the insured as a defense in a suit brought by an injured member of the public within the class sought to be protected by statute (citations omitted)." 193 F.2d p. 453.

Although this court in Mayflower relied on the policy of protecting the public from uninsured motorists and the desire to avoid excessive reliance on welfare agencies, it was error to employ such a policy factor to read into a statute something that is clearly not there, or to ignore as "artful" distinctions that were clearly intended by the legislature. Though absolute liability regarding insurance coverage of injured third parties may be a legitimate goal, and indeed a desirable one, it is not the function of the courts to legislate such measures into the law. Of some consolation is the fact that, since the Mayflower case, the legislature of this state has added A.R.S. § 20–259.01 to our insurance code to cover many of the considerations that were at the heart of the Mayflower decision. That section provides:

"§ 20–259.01. Coverage to include protection from operators of uninsured motor vehicles; right of rejection; supplemental or renewal policy

On and after January 1, 1966, no automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle, shall be delivered or issued for delivery in this state, with respect to any motor vehicle registered or principally garaged in this state, unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in § 28–1142, under provisions filed with and approved by the insurance director, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom. This coverage shall at the time the policy is issued be called to the attention of the named insured who shall have the right to reject such coverage. Unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer." Added Laws 1965, Ch. 34, § 1.

In White v. Bateman, 89 Ariz. 110, 358 P. 2d 712, we quoted with approval the following in regards to the force of case law precedence:

"A deliberate or solemn decision of a court or judge, made after argument on a question of law fairly arising in a case, and necessary to its determination, is an authority, or binding precedent, in the same court or in other courts of equal or lower rank, in subsequent cases, where 'the very point' is again in controversy; but the degree of authority belonging to such a precedent depends, of necessity, on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion or exigency of the doctrine is, in the last analysis, moral and intellectual rather than arbitrary or inflexible." 89 Ariz. p. 113, 358 P.2d p. 714.

The Mayflower case is clearly erroneous. I think that it should be overruled, and that the present case is in the proper posture for doing so.

Further, I feel the majority was wrong for not having remanded this case for a trial on the merits.