535 P.2d 17

Ruth PARSONS, a single woman, Dawn Parsons and Gail Parsons, minors, by and through their guardian ad litem, Donald S. Robinson; and Michael Smithey, by his guardian ad litem, Appellants,

v.

CONTINENTAL NATIONAL AMERICAN GROUP, Appellee.

No. 2 CA–CIV 1688.

Court of Appeals of Arizona, Division 2.

May 13, 1975.

Rehearing Denied June 20, 1975.

Review Granted Sept. 18, 1975.

Robertson, Molloy, Fickett & Jones, P. C. by Michael J. Meehan, and Burton J. Kinerk, Tucson, for appellants.

Chandler, Tullar, Udall & Richmond by D. B. Udall, Tucson, for appellee.

OPINION

HATHAWAY, Judge.

The Parsons garnished Continental National American Group, hereinafter referred to as CNA, upon the liability coverage of a homeowner's policy for the Smithey family. The carrier denied any indebtedness, placing coverage and related questions in issue.

The issues tried at the garnishment trial were the applicability of an intentional act exclusion of the policy; whether CNA was

estopped to claim the exclusion or had waived it (1) by undertaking defense and settlement negotiations on the Parsons' claim without making a proper disclaimer of coverage to Michael Smithey or the Parsons or (2) by improperly making use of information, germane to the issue, acquired by its fiduciary relationship; and whether CNA had become liable to pay the entire judgment, by refusing to settle or negotiate settlement of the Parsons' claim, solely because it concluded there was no insurance coverage.

The trial court resolved all issues in favor of garnishee, CNA, and entered judgment in its favor, hence this appeal.

Fourteen-year-old Michael Smithey climbed out of his bedroom window in the nighttime and broke into the house of his next door neighbors, the Parsons, where he undertook a series of attacks upon Ruth Parsons, and her daughters, Dawn and Gail. The events that transpired are described in our prior opinion, dealing with a claim against other defendants not presently before the court. See Parsons v. Smithey, 15 Ariz.App. 412, 489 P.2d 75 (1971):

"On the night of March 26, 1967, Michael, the defendants' son, forced his way into Mrs. Parsons' bedroom through a glass sliding door in the Parsons' residence. He began beating Mrs. Parsons over the head with a hammer, she screamed thereby awakening her two younger daughters who came running into her bedroom to find her on the floor, bleeding, and still being struck by Michael with the hammer. The girls were unsuccessful in their attempts to separate Michael from their mother, whereupon Mrs. Parsons directed one of them to phone the police from the other room. When the daughter ran to do so, Michael ran after her with the hammer, beating her. She therefore ran back to the bedroom and they locked the door, shutting Michael out. However, he reentered through the outside door after having obtained a knife from the kitchen. He assaulted the women with the knife and also with a large belt buckle.

The daughters finally induced Michael to leave by giving him some money. In departing, he stated, 'If you tell anybody, I'll kill you.'" 15 Ariz.App. at 413–414, 489 P.2d at 77.

Michael was taken into custody of the Pima County Juvenile Court. During his processing through the court, Dr. Lewis Hertz, a professor of psychology and juvenile court consultant, examined Michael, tested him and submitted an evaluation of his mental condition. At the garnishment hearing, Dr. Hertz testified as to Michael's mental condition at the time of the attack. The transcript shows the following testimony:

"I felt his control was minimal. That he wasn't responsible for his behavior. He didn't consider the consequences of his behavior. That he was not in a position to consider the comfort or safety of the people that he was interacting with.

\* \* \* \* \* \*

At that time there was no rational consideration.

Q. I ask you the question again, doctor. As regards to temporarily insane would it relate to the situation as far as Michael Smithey and his mental state of mind was at the time in question?

A. I would say that it does, he certainly wasn't in command of his behavior.

\* \* \* \* \* \*

That night he didn't have the ability to control his impulses. He acted irrationally. He acted without consideration of the consequences."

CNA presented no evidence to controvert Dr. Hertz's conclusion. It rested on the events of March 26 and the presumption of sanity as proof that the acts were intentional within the meaning of the exclusion provision.

In April of 1967, CNA began an investigation of the Parsons' claim against the Smitheys. Frank Candelaria wrote to Howard Watt, the Smitheys' personal attorney on June 6, 1967, advising that CNA was "now in the final stages of our inves-

tigation." He requested that the Smitheys contact the claimant's attorney and obtain from him copies of bills verifying expenses incurred and a demand for settlement of the matter in order to commence negotiations. Mr. Watt complied, and subsequently received medical bills from the Parsons' attorney which he forwarded to Candelaria. On August 11, Candelaria reported his investigative progress to his company and stated:

"In view of this information gathered, and in discussion with the boy's father's attorney, Mr. Howard Watts, [sic] and with the boy's parents, I am reasonably convinced that the boy was not in control of his senses at the time of this incident.

It is, therefore, my suggestion that, and unless instructed otherwise, I will proceed to commence settlement negotiations with the claimant's attorney so that this matter may be disposed of as soon as possible."

An attempt was made on June 2, 1967, to settle the matter for the amount of the medical expenses incurred by the Parsons and a draft payable to them was tendered. The draft was not accepted by them and was returned by the Smitheys' attorney with the request that he be kept informed of any further developments. On August 23, 1967, Candelaria again advised his superiors, "It has been decided that coverage is in order, and that settlement should be attempted. I have contacted claimant's attorney and have offered to pay all medical expenses, which amount to approximately $1,450."

On October 23, he reported another futile effort to settle the case for medical specials.

In October, 1967, the Parsons filed suit and CNA retained Tucson counsel to undertake the Smitheys' defense. On November 10, 1967, CNA's attorney wrote to the company, stating inter alia:

"I have secured a rather complete and confidential file on the minor insured who is now in the Paso Robles School for Boys, a maximum-security institution with facilities for psychiatric treatment, and he will be kept there indefinitely and certainly for at least six months . . . The above referred to confidential file shows that the boy is fully aware of his acts and he knew what he was doing was wrong. It follows, therefore, that the assault he committed on claimants can only be a deliberate act on his part."

The letter also directed Mr. Candelaria to send the insureds a "non-waiver agreement." Five days later, Mr. Candelaria wrote the following letter to Mr. and Mrs. Smithey:

"This matter arises out of an act wherein your son, Michael Smithy, [sic] assaulted Mrs. Ruth Parsons and her two daughters, Dawn and Gail, on the night of March 26, 1967, and also out of the alleged negligence on your behalf for failure to provide professional and medical attention for your son.

Your Policy No. HO 4620898 under which this matter presumably is reported to us specifically excludes liability for bodily injury caused by an intentional act. Because of the possibility of this act being found to be an intentional act, we accept notice subject to full reservations of all of our rights under the policy.

As a matter of courtesy and to extend to you every assistance possible, we shall proceed with the investigation, adjustment and defense of this claim upon the understanding that in so doing we do not waive any of our rights under the policy and subject also to the understanding that you are not to waive any rights you may have.

We ask that you acknowledge receipt and agreement of this non-waiver by signing this letter where indicated below and return to us immediately."

On May 26, 1969, the CNA attorneys for Michael Smithey interviewed him and obtained a narrative statement of the March

events. The following day they wrote to CNA:

> "His own story makes it obvious that his acts were willful and criminal."

Candelaria wrote another reservation letter shortly thereafter to Mr. and Mrs. Smithey again noting the intentional act exclusion and stating that neither CNA nor the Smitheys were deemed to waive any rights by virtue of the reservation letter.

When the litigation began, the Parsons' $22,500 settlement demand was refused by CNA as "completely unrealistic" in a letter to the Parsons' attorneys.

Early in 1969, CNA asked counsel retained to defend Michael Smithey, his evaluation of the case. Counsel responded that "assuming liability and coverage, the injury is worth the full amount of the policy or $25,000." No defense of Michael was presented and a $50,000 judgment against him resulted. The garnishment proceedings followed, with CNA being defended by the same law firm which had represented the Smitheys at CNA's request, and which had forwarded to CNA the information available to it about, and its conclusions on, the issue of liability coverage.

At the inception of the garnishment trial, counsel presently representing Michael Smithey noted that the attorneys for CNA had not withdrawn their appearance on behalf of Michael and presented a motion in limine requesting that evidence offered by the garnishee be excluded on the grounds that it had been obtained in a breach of fiduciary relationship between CNA and its designated attorneys and Michael Smithey. The motion was denied.

Among the findings of fact was a conclusion that CNA "within a reasonable time entered into an agreement with" the Smitheys to undertake defense of the Parsons' litigation while reserving its right to deny coverage. The court found that Michael Smithey's attack on Ruth Parsons was "intended to rape and kill her," that he "intended the probable and actual consequences of his acts," that he "intended to cause the injuries to plaintiffs that he did

in fact cause," and that he "had the specific intent to cause harm to the persons that he did cause." The court further found that at the time of the attack he "was not psychotic and was able to form and did form the requisite intent to commit the acts complained of," and that the injuries to the plaintiffs were "caused intentionally" by Michael Smithey.

All issues were decided against the Parsons and in favor of CNA: the intentional act exclusion applied, CNA was not estopped to deny coverage, had not waived its right to do so, and was not guilty of laches.

Appellants contend on appeal that the evidence compelled a conclusion that CNA had waived and was estopped to assert the intentional act exclusion in view of its decision to deny coverage only after receiving confidential information from counsel it had retained to represent Michael Smithey, which was the fruit of that representation.

Frank Candelaria had determined that coverage existed and was proceeding accordingly until the attorneys retained by CNA for and while representing Michael obtained a confidential file leading them to conclude that the act was intentional and therefore excluded under the policy. Additional support for that conclusion was supplied by the attorneys to CNA as a result of further preparation of the case, including discovery and attorney-client interviews with Michael Smithey.

Appellants contend that the mere continuation of the conflict of interest presented by the same attorney advising CNA about the exclusion while providing a defense for Michael, and thereafter asserting the exclusion against Michael in garnishment proceedings, has been held sufficiently prejudicial to estop the carrier from thereafter relying on the exclusion. They cite Employers Casualty Company v. Tilley, 496 S.W.2d 552 (Tex.1973), where an insurance company was barred from raising an exclusion which its retained attorneys had developed from information obtained out

of their representation of the insured. In Employers Casualty Company v. Tilley, supra, the same attorney represented the insured and the company for 18 months, and in the course of conducting discovery, briefed the carrier on the validity of the lack-of-notice defense. The Texas court discussed the ethical problem of an attorney representing both an insured and the carrier without a full and complete discussion and disclosure of the specific conflict of interest, and held:

> "Conduct in violation of the above principles by the insurer through the attorney selected by it to represent the insured has been condemned by the highest courts of several other jurisdictions. In Perkoski v. Wilson, 371 Pa. 553, 92 A.2d 189 (1952); Tiedtke v. Fidelity and Casualty Company of New York, 222 So.2d 206 (Fla.1969); Bogle v. Conway, 199 Kan. 707, 433 P.2d 407 (1967); Crum v. Anchor Casualty Company, 264 Minn. 378, 119 N.W.2d 703 (1963); Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 179 A.2d 505 (1962); and Van Dyke v. White, 55 Wash.2d 601, 349 P. 2d 430 (1960), analogous conduct in violation of such principles was held to preclude or estop the insurer from denying coverage or liability. See also general criticisms and consequences of such conduct discussed in Meirthew v. Last, 376 Mich. 33, 135 N.W.2d 353 (1965); and Newcomb v. Meiss, 263 Minn. 315, 116 N.W.2d 593 (1962)." 496 S.W.2d at 559.

The court also held that the existence of a general non-waiver agreement was insufficient to satisfy the ethical requirement of full disclosure and could not save the insurer from estoppel to raise the exclusion. Subsequent use of the same attorney to litigate the exclusion question, the Texas court held, compounded the prejudice to the insured and reinforced a holding of estoppel to raise the exclusion.

This rule has also been followed in Pacific Indemnity Company v. Acel Delivery Service, Inc., 485 F.2d 1169 (5th Cir. 1973), cert. den., 415 U.S. 921, 94 S.

Ct. 1422, 39 L.Ed.2d 476 (1974); Hanover Insurance Group v. Cameron, 122 N.J.Super. 51, 298 A.2d 715 (1973). An attorney of record is the representative of his client and must represent that client to the exclusion of all other interests, Delaney v. Husband, 64 N.J.L. 275, 45 A. 265 (1900), and may not impeach his client for the benefit of the insurance company. Gass v. Carducci, 37 Ill.App.2d 181, 185 N.E.2d 285 (1962); Katz v. Ross, 216 F.2d 880 (3rd Cir. 1954). Such counsel may not depose an insured for the purpose of placing the company in a position to disclaim liability. Allstate Insurance Company v. Keller, 17 Ill.App.2d 44, 149 N.E.2d 482 (1958); American Home Assurance Company v. Sand, 253 F.Supp. 942 (D.Ariz.1965); 97 C.J.S. Witnesses § 276d (where an attorney may not ethically disclose privileged matters to an insurer for purpose of a policy defense.)

In Informal Opinion Number 949, August 8, 1966, the ABA Standing Committee on Professional Ethics stated:

> "If the firm does represent the insured in the personal injury action, to subsequently reveal to the insurer any information received from the insured for possible use by the insurer in defense of a garnishment proceeding by the injured person, would be a clear violation of both Canon 6 and Canon 37 regarding confidences of a client. A successful defense of the garnishment proceeding by the insurer would be contrary to the interests of the insured, because if the insurer is not obligated to pay the judgment, excecution against the insured can be expected. The result would not be different in practical effect from a suit directly against the insured to escape liability under the policy.
>
> If the firm does not defend the insured in the personal injury action, the firm cannot reasonably expect the attorney who does represent the insured to furnish either to the firm or to the insurer, for use in a garnishment action by the injured person against the insurer,

information that attorney learns during the course of defending the insured, since that attorney should not be expected to breach his professional obligations by furnishing information Canons 6 and 37 prohibit him from furnishing."

The State Bar of Arizona, Committee on Rules of Professional Conduct, adopted the same position in Arizona Ethics Opinions No. 261, November 15, 1968, and No. 282, May 1, 1965.

In Arizona Ethics Opinion No. 261, the committee said:

"ABA Informal Opinion C–728 makes it very clear that the inquiring attorney is the attorney for the insured, B, even though the attorney would be paid by G Insurance Company. The undivided fidelity owed by the attorney, then, is to B and not to G Insurance Company.

Although ABA Informal Opinion C–728 was based on a fact situation of a declaratory judgment action being filed after judgment in a personal injury action, this Committee does not see that the fact situation presented there and the one presented here can, in reality, be differentiated. It is the opinion of this Committee that ABA Informal Opinion C–728 should be construed to hold that it was unethical for the inquiring attorney to represent the insurance company in an action against the insured, after judgment against the insured, to declare that the policy did not provide coverage. A full reading of that opinion and in particular the last paragraph thereof, leads us to this conclusion. That opinion ended as follows:

'Is it now ethical for you to represent the company in an action against the insured to declare that the policy does not cover? We believe that to do so without full disclosure and full consent on the part of the insured would be a violation of Canon 6. Your connection with the case on behalf of the insured no doubt has resulted in the development of confidences of a nature that should in good conscience require you to decline representation of the company in a case so intimately tied to your original litigation. This is particularly true when one of the ideas involved is not only to be fair but to give all appearances of fairness.'

Although our Arizona Opinion No. 146 may be distinguished from the present inquiry on the facts presented in that opinion, it is the feeling of this Committee that ABA Informal Opinion No. C–728 and the conclusion necessarily reached in this present inquiry require us to overrule in part Arizona Opinion No. 146. We therefore expressly overrule and modify the last paragraph of Arizona Opinion No. 146 such that that paragraph will now read as follows:

'If the attorney for the defendant believes that the defendant was attempting to commit suicide at the time of the collision, and has evidence to support that belief, and as a result believes that the insurance carrier has a policy defense which he wishes to raise, he should defend under a reservation of rights and not present such evidence at the time of trial, or should *advise the insurance company to bring a declaratory judgment action on the issue, advising the insurance carrier and the insured that he cannot participate in such declaratory judgment action on behalf of either the insurance carrier or the insured.* To do otherwise would be a violation of his duty to the defendant insured and would be a breach of Canon 6 involving conflicting interests.' (italicized portion indicates modification) . . .

The questions presented are therefore answered as follows:

1. The inquiring attorney and his law firm may not ethically file and prosecute a declaratory judgment action for and on behalf of G Insurance Company, wherein a determination would be sought by the attorney and his firm that there is, in fact, no coverage for the described accident afforded to defendant B under any circumstances.

2. The inquiring attorney and his law firm may not commence and prosecute such a declaratory judgment action even after a full disclosure made to B and B's consent to the action being given thereto."

The committee, in dealing with the situation in Arizona Ethics Opinion No. 282, stated:

"No better statement of the basis for our position on this question occurs to us than the following quotation from the Blakslee article cited above (55 A.B.A. Jour. at p. 263):

'Although the opinions of the Committee state that the lawyer represents both the insurer and insured, it is clear that his highest duty is to the insured and that the lawyer cannot be used as an agent of the company to supply information detrimental to the insured. The lawyer is a professional retained pursuant to the terms of a contract between the insurer and insured. The company has a right to expect that the issue of liability for injury and damages will be effectively and forcefully presented by the lawyer it has chosen. It has agreed, by its contract, to pay damages once they are determined.

'The client, on the other hand, in order to obtain an insurance policy, has given up the right to direct the incidents of the trial by agreeing that the company shall have the right to choose the attorney. This also is fair since it is the company that will ultimately pay the judgment. But counsel should not be expected to communicate information received in confidence or to betray confidences lodged in them by trusting clients. To do so would not only destroy public confidence in the legal profession, but also would make defense attorneys investigators for carriers. That the company has not satisfied itself concerning coverage by its other, independent methods, is no compelling reason why defense counsel should be asked to betray the trust reposed in him by the insured. The fact that the company may be required to pay a monetary judgment does not alter the situation, since the company voluntarily has assumed this contractual obligation by virtue of its existence as an insurer. Its contractual obligation, voluntarily assumed, should not be permitted to be used as the basis for converting the defense counsel into something beyond a lawyer defending a client.'"

■ Because the company took advantage of the fiduciary relation of its agent, the retained attorneys, to have access to the confidential file from Paso Robles and the fruits of attorney-client interviews, as well as the inherent prejudice of having a defense asserted in the tort case by an attorney whose loyalty was clearly shown, by the correspondence, to be with the company, and whose attention was frequently directed to the policy exclusion, the trial court should have held as a matter of law that CNA was estopped to deny coverage and had waived the intentional act exclusion.

■ By refusing to settle or negotiate settlement, CNA failed to give consideration to the interests of the insured and therefore is liable for the entire amount of the Parsons' judgment against Michael Smithey. In determining whether an insurer has negotiated in good faith in rejecting an offer of settlement, the Arizona Supreme Court set forth the "bad faith" test as follows:

" . . . [W]hen the insurer is defending litigation against the insured, employs attorneys to represent the interests of both and has sole power and opportunity to make a settlement which would result in the protection of the insured against excess liability, common honesty demands that it not be moved by partiality to itself nor be required to give the interests of the insured preferential consideration. A violator of this rule of equality of consideration cannot be said to have acted in good faith."

**604**

Farmers Insurance Exchange v. Henderson, 82 Ariz. 335, 338–339, 313 P.2d 404, 406 (1957).

We have spoken on the denial of settlement based upon the belief of non-coverage. State Farm Auto Ins. Co. v. Civil Service Emp. Ins. Co., 19 Ariz.App. 594, 509 P.2d 725 (1973), stating:

" . . . [I]s the same test equally applicable when the insurer, entertaining 'an honest though erroneous belief' that there was no coverage under the policy, refuses to give *any* consideration to the proposed settlement? In answering this question, it must be kept in mind that the insurer's obligation to settle, as well as the obligation to defend, arises out of the contract between the parties. The mere fact that an insurer has erroneously concluded that there is no coverage and therefore in good faith refuses to defend, cannot excuse subsequent breaches by the insurer of other provisions of the contract, including the implied obligations pertaining to settlement. . . . We therefore hold that under such circumstances the insurer erroneously denying coverage and consequently refusing to give consideration to a settlement offer, will be liable to its insured for any judgment subsequently entered against the insured in excess of policy limits, *unless* the insurer shows that an application of the equality of consideration test would not have required acceptance of the settlement offer. We recognize that this places a heavy burden on the insurer. However, when the insurer breaches his contract and erroneously refuses to defend, he does so at his own peril. Carpenter v. Superior Court, 101 Ariz. 565, 422 P.2d 129 (1967); Comunale, supra." 19 Ariz.App. at 602–603, 509 P.2d at 734.

For the foregoing reasons, the judgment is reversed and it is ordered that judgment be entered in favor of appellants in the sum of $50,000.

KRUCKER, J., and LLOYD FERNANDEZ, Superior Court Judge, concur.

NOTE: Chief Judge LAWRENCE HOWARD having requested that he be relieved from consideration of this matter, Judge LLOYD FERNANDEZ was called to sit in his stead and participate in the determination of this decision.